738 So.2d 172 (1999)
James Joseph PINSONNEAULT, et al., Plaintiffs-Appellants,
v.
MERCHANTS & FARMERS BANK & TRUST COMPANY, et al., Defendants-Appellees.
No. 99-12.
Court of Appeal of Louisiana, Third Circuit.
July 21, 1999.
Rehearing Denied August 18, 1999.
*175 John K. (Mike) Anderson, Leesville, Christopher Whittington, Baton Rouge, for James Joseph Pinsonneault et al.
Russell L. Potter, Andrew Parker Texada, Mark D. Pearce, Alexandria, for Merchants & Farmers Bank & Trust Co.
Kimberly Atkins, pro se.
Lawson Strickland, pro se.
Christian Boyd, pro se.
BEFORE: YELVERTON, THIBODEAUX, and SULLIVAN, Judges.
THIBODEAUX, Judge.
Jesse Pinsonneault was murdered on November 3, 1992, as he attempted to deposit his employer's daily receipts into the night depository of Merchants & Farmers Bank & Trust Company. His parents, James and Debra Mae (Debbie) Pinsonneault, filed a wrongful death suit against the defendant bank alleging various breaches of security.[1] Following a bench trial, the trial court determined that *176 Merchants Bank had not breached its duty to provide security to its patrons. The Pinsonneaults appeal the judgment dismissing their wrongful death suit against Merchants Bank.
For the following reasons, we reverse the finding of the trial court and assess damages of $1,236,890.87 to Merchants Bank for its failure to provide security for its patrons. The attackers were trustees who had escaped from the Vernon Parish Jail five days before the shooting; we find no liability against the Vernon Parish Sheriff because the attackers were no longer in the process of escaping when the shooting occurred. We further find that this is not an appropriate case in which to assess damages to the intentional tortfeasors even though we are mandated by La.Civ.Code art. 2323 to quantify the fault of the intentional tortfeasors.[2]

I.

ISSUES
We must decide:
1) whether the defendant bank owed a duty to provide security for its night deposit patrons;
2) whether the defendant bank adequately discharged its duty to provide security for its night deposit patrons;
3) whether a breach on the defendant's part was the legal cause of the injuries of Jesse Pinsonneault;
4) whether the plaintiffs are entitled to damages for the wrongful death of Jesse Pinsonneault and, if so, the quantum amounts due for each element of damages;
5) whether the fault in this case should be apportioned among the negligent tortfeasor and the intentional tortfeasors; and
6) whether the negligent tortfeasor is entitled to contribution from the intentional tortfeasors.

II.

FACTS
On November 3, 1992, at approximately 1:30 a.m., twenty-three-year-old Jesse Pinsonneault left work at Sambino's Pizza and drove around to the Merchants & Farmers Bank & Trust Company (Merchants Bank) in order to deposit the evening's receipts and operating cash into the bank's night deposit box. The bank branch is located at Entrance Road which leads to Fort Polk in Leesville, Louisiana. Jesse was the assistant manager of Sambino's Pizza, which is approximately 300 feet from the bank. As Jesse got out of his car and walked up to the night drop, Lawson Strickland suddenly appeared and demanded the deposit money. Strickland then shot Jesse in the area of the clavicle and took the bag containing $64.06 in cash. The bullet severed Jesse's spinal cord and caused profuse bleeding. Jesse's mother, Debra Mae Pinsonneault, was called to the scene where she witnessed her son lying in a pool of blood on the cement near the night deposit box, his body shaking and his face streaked with tears. Jesse became paralyzed and ultimately died at an Alexandria hospital nine hours after the shooting.
Lawson Strickland and his primary accomplice, Christian Boyd, escaped into the woods behind the bank and were apprehended approximately three days later. At the time of the shooting, Strickland and Boyd had five days earlier escaped from the Vernon Parish Jail, where they were trustees. Strickland, who is on death row, pleaded his Fifth Amendment right to silence, and he refused to testify in the civil trial of this matter. However, Christian Boyd testified that he and Strickland planned to rob a customer at the night *177 drop of Merchants Bank at Entrance Road in particular because it offered the best cover with regard to shrubbery, lighting, the side location of the night deposit box, and the absence of surveillance cameras. Boyd further testified that he and Strick-land had hidden out in the area behind the bank and had watched the night deposit for hours the night before the robbery, and planned their escape through the woods behind the bank. Merchants Bank is located in an area of Vernon Parish which had the second highest crime rate in 1992 for the parish. Two previous armed robberies had occurred at this Merchants Bank branch at the time of the shooting, with the perpetrators escaping once through the woods behind the bank, and once by helicopter.
Jesse's parents brought a wrongful death suit and survival action against Merchants Bank and its insurer, Aetna Casualty & Surety Company (both hereinafter referred to as "Merchants Bank"), for its failure to provide security for its customers after inviting them to bring money to the bank's night deposit box. Suit was also filed against the Sheriff of Vernon Parish for allowing the perpetrators to escape. The Sheriff settled with the Pinsonneault family prior to trial. Jesse's mother, Debra Mae Pinsonneault (Debbie), before her death due to cancer, also brought a claim for the severe emotional distress she suffered upon seeing Jesse within an hour of the shooting as he lay bleeding and dying at the bank night depository. After her death, Jesse's twin brother, Orin David Pinsonneault, became succession representative and was substituted as the party asserting the claims of Debra Pinsonneault.
Merchants Bank brought third party claims against Strickland, Boyd, and Kim Atkins, a minor at the time of the shooting, who provided transportation to Strickland and Boyd and who gave them the gun used in the shooting. The bank also asserted as affirmative defenses the fault of the Sheriff of Vernon Parish and the negligence of the Sambino's Pizza entities. Both the Pinsonneault family and Merchants Bank requested a jury trial, but Merchants Bank was subsequently granted a motion to strike the jury trial. Following a bench trial, the trial court dismissed the plaintiffs' suit against Merchants Bank, finding that the bank did indeed owe a duty of protection to Jesse Pinsonneault, but that the bank had adequately discharged its duty to provide security for its patrons and was not liable for Jesse's death. The Pinsonneault family appealed. For the following reasons, we reverse the trial court and assess damages at one hundred percent against Merchants Bank.

III.

LAW AND DISCUSSION

Standard of Review
An appellate court may not set aside a trial court's or jury's finding of fact in the absence of "manifest error"or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989).
In order to reverse under the manifest error rule:
1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). A reviewing court must do more than just review the evidence which supports or controverts the trial court's findings. It must review the entire record to determine whether the trial court's findings were clearly wrong or manifestly erroneous. Id.

Assignments of Error
Merchants Bank has asserted two errors as follows:

*178 1. It was error for the trial judge to find that Merchants & Farmers Bank owed a legal duty to Jesse Pinsonneault;
2. In the alternative, and only in the event the court of appeal reverses on the issue of liability, then defendants/appellees, assert that it was error for the trial court to dismiss the third party claims of defendants/appellees.
The Pinsonneault family asserts the following errors:
1. The trial court erred in finding that the Merchants & Farmers Bank & Trust Company properly discharged its duty to provide security for its patrons;
2. The trial court erred in denying the plaintiffs a trial by jury;
3. The trial court erred in failing to award the plaintiffs damages as a result of Merchants & Farmers Bank & Trust Company's breach of its assumed duty.
As a threshold matter, because we are reversing the trial court's judgment and awarding damages to the Pinsonneault family, we need not address the Pinsonneault's assignment regarding the denial of a trial by jury. The remaining assignments of error revolve around the negligence cause of action asserted by the Pinsonneault family against Merchants Bank and the third party claims of Merchants Bank against Strickland, Boyd and Atkins.
Louisiana employs a duty-risk analysis to determine legal responsibility in negligence claims. The determination of liability usually requires proof of five separate elements:
1. Proof that the defendant had a duty to conform his conduct to a specific standard (the duty element);
2. Proof that the defendant's conduct failed to conform to the appropriate standard (the breach element);
3. Proof that the defendant's substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-infact element);
4. Proof that the defendant's substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and
5. Proof of actual damages (the damages element).
Fowler v. Roberts, 556 So.2d 1 (La.1989).
Prior to the Louisiana Supreme Court's decision in Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962), Louisiana courts generally determined liability by using the proximate cause approach, wherein the third and fourth elements were combined into a single inquiry. However, the proximate cause approach was simplistic and ignored complicating factors such as multiple defendants and multiple causes. As articulated in Fowler:
Determination of causation by first determining whether the defendant breached a standard of care imposed on him and then testing for proximate cause also tended to exclude from liability all but the defendant whose negligence occurred latest in point of time. Because the proximate cause approach often included distinctions between active and passive negligence, there was a tendency to place further undue emphasis on the chronology of acts or omissions. As a consequence, many tort cases determined by the proximate cause approach resulted in holding only one defendant liable, even though two or more parties were guilty of substantial contributing misconduct. Another important weakness of the proximate cause approach was that it failed to determine factual causation in relationship with the other issues in the case which affect liability, rendering the approach relatively devoid of flexibility and of opportunity for analytical examination.
The duty-risk approach to determining liability in negligence cases was *179 adopted in Dixie and subsequently refined in Pierre v. Allstate, 257 La. 471, 242 So.2d 821 (1970). The decision in Pierre employed the method of determining causation first by inquiring into cause-in-fact, and then determining whether there is a duty imposed under the law, whether the risk is within the scope of protection contemplated by imposition of that duty, and whether there is a breach of that duty which calls for a response in damages. In most cases the result from applying either approach will be the same. However, the duty-risk approach is more policy orientated and offers a better opportunity for use of logic and reasoning, particularly when the critical issue in the case involves the scope of protection contemplated by the statute or rule of law which imposed the duty that was breached.
Fowler, 556 So.2d at 5 (citations omitted).
In the present case, the plaintiffs allege that Merchants Bank was negligent because it failed to provide security for its patrons whom it invited upon the premises to deposit money into the bank's night depository. Hence, under the duty-risk analysis, the plaintiffs must show that: (1) the failure of Merchants Bank to institute security measures was a cause-in-fact of the robbery, shooting injuries, and subsequent death of Jesse Pinsonneault; (2) Merchants Bank owed a duty to protect Jesse Pinsonneault from harm; (3) the risk of robbery and the shooting at the night depository was within the scope of protection contemplated by the imposition of that duty; (4) Merchants Bank breached the duty to protect Jesse Pinsonneault from criminal attack; and (5) the Pinsonneault family is entitled to damages for their wrongful death, survival, and bystander claims.
The security measures which the plaintiffs allege should have been in place to prevent the robbery and criminal attack are surveillance cameras at the night depository for deterrence, lower shrubbery to prevent hiding places, improved lighting in the back and parking areas to prevent criminals from hiding and running under cover of darkness, and a continuous, threesided fence that completely closes the bank off from the woods behind it. Therefore, the first question we must decide is whether the absence of these security features was a cause-in-fact of the robbery and shooting death of Jesse Pinsonneault.

CAUSE-IN-FACT ELEMENT
Under the duty-risk analysis, cause-in-fact is generally a "but for" inquiry. The plaintiff need only show that he probably would not have sustained the injuries that befell him but for the negligent conduct of the defendant. See Stroik v. Ponseti, 96-2897 (La.9/9/97); 699 So.2d 1072. In the present case, the only eye witness to the shooting of Jesse Pinsonneault, other than the shooter, Lawson Strickland, was the accomplice, Christian Boyd. Boyd testified that he was familiar with the Merchants Bank branch at Entrance Road Fort Polk because he had been there earlier in 1992. He stated that this particular bank was chosen for the robbery because "it was just an easy place to go to ... you could go there, you could pull off the crime, you could hide, and you'd make it ... if it was dark, and there was nothing else in there to stop you from doing it." He stated that the other banks in the area were out in the open and surrounded by businesses but that this branch had woods around it which offered a hiding place and an escape route.
Boyd stated that he and Strickland went to Merchants Bank the night before the actual robbery, and hid behind the bank's fence for hours watching the night depository and looking for places to hide. Their intent initially was to rob the person making a deposit for the nearby Shell Station until they determined that Shell did not make night deposits. Upon seeing Jesse Pinsonneault bring the deposit from Sambino's Pizza, they decided to come back the next night and take the Sambino's deposit. Boyd stated that

*180 [w]e had to find a place where he [Strickland] could see me and I could see him, plus I could see over there to tell when they were leaving, when they were coming around and whatever. So I hid up on top of the hill behind them big trees, and he hid down behind the bushes behind the bankso we could see each other.
Boyd stated that the bushes along the back wall and corner of the bank were thick, three and a half to four feet tall, and formed a straight-lined hedge that he could not see through. Boyd stated that if the bushes had not been there, or had been low to the ground, there would not have been any where to hide, and that "you'd have to run from the woods, and there's too much chance of getting caught." When asked whether the shorter bushes depicted in later photographs would have altered their decision to commit the robbery, he responded, "It probably would have, yes." He further stated that he and Strickland had discussed this issue when planning the robbery. After the robbery, they ran into the woods behind the bank and got away on foot.
Boyd further stated that the lights at the night deposit did not deter them because it was such a short distance to the surrounding areas where it was not very light. He stated that
There's not that much space there. You can walk that in a second. I mean, it would be too late. Those lights didn't matter. They didn't stop us.
As to the lighting away from the night deposit, Boyd indicated that it contributed to Strickland's ability to hide behind the bank until Jesse got out of his car. Boyd acted as lookout and hid atop a hill where he could see Sambino's Pizza and the back of the bank. Strickland, when hiding in the bushes behind the bank, could see Boyd, but Boyd could not see Strickland in the bushes because of the lighting.
That's why I couldn't see him. There'sback here, there's really not any lighting, and in the parking lot, it's real dim.
Boyd stated that he saw small boxes installed overhead under the overhang at the night drop but did not see cameras in them. When asked whether surveillance cameras would have deterred him, he stated
If I saw cameras that I knew were working, I think it would have affected it big time ...
If I knew they were there? Oh, I'm pretty sure we wouldn't have done it. Been stupid then.
Boyd further stated that the fence at the time of the shooting was all the way back to the edge of the woods behind the bank but did not come around to enclose the sides of the premises, and that if it had, "We wouldn't have had nowhere to go." When asked whether the fence affected their decision to rob a Merchants Bank customer, Boyd responded "Definitely.... Because he would have to run into the road, and it would be wide open. A lot of people would be able to see him then.... It wouldn't have been able to be done...."
Boyd further testified that if the night deposit box, which was located on the side of the bank, had been in front where the ATM machine is, that "[w]e couldn't' have done it.... Because it's facing the road.... [E]verybody would see. It's too much traffic."
Based upon the foregoing, it is probable that but for Merchants Bank's decisions to maintain high thick shrubbery along its unlighted back wall, place a partial fence only at the edge of the woods and down one side of the property, locate its night depository at a less visible side location, and maintain low lighting in the parking area, the armed robbery and shooting of Jesse Pinsonneault would not have occurred. Therefore, Merchants Bank's conduct is a cause-in-fact of the plaintiffs' harm, and the first element in the duty-risk analysis is met. We must now decide *181 whether Merchants Bank owed a duty to Jesse Pinsonneault to protect him and whether the scope of protection contemplated by the imposition of the duty encompassed the risk of harm that befell him. If there was a duty, and the duty encompassed the risk, then breach of the duty is the legal cause of the shooting death of Jesse Pinsonneault, and damages are due his family.

DUTY ELEMENT
The law is clear that the owner of a business who permits the public to enter his establishment has a duty to exercise reasonable care to protect those who do enter. This duty extends to keeping the premises safe from unreasonable risks of harm or warning persons of known dangers. Rodriguez v. New Orleans Pub. Serv., Inc., 400 So.2d 884 (La.1981); Bordelon v. Pelican State Mut. Ins. Co., 599 So.2d 511 (La.App. 3 Cir.1992). The duty of a landowner is not to insure against the possibility of an accident on his premises, but rather to act reasonably in view of the probability of injury to others. Shelton v. Aetna Cas. & Sur. Co., 334 So.2d 406 (La.1976). Storekeepers and property owners are under a duty to keep their premises in a safe condition for use in a manner consistent with the purposes thereof. Mumphrey v. Rollins, 468 So.2d 580 (La.App. 3 Cir.1985).
Hence, it is well-settled that business establishments of all kinds have a general duty to keep the premises safe for those patrons invited to do business thereon. This jurisprudential duty is widely applied to cover a multitude of incidents including vehicular and pedestrian incidents such as slip and fall accidents. The question in this case, however, is whether the duty to protect encompasses the risk of robbery by third persons, and thus becomes a "scope of protection" inquiry. As more fully explained in the following analysis of the "legal cause" or "scope of protection" element of the duty-risk analysis, we find that "a safe condition for use in a manner consistent with the purposes thereof" when applied to the defendant bank, includes whatever safety features and protections are reasonably needed to protect from attack those patrons who are invited to bring money to its night depository.

RISKSCOPE OF PROTECTION LEGAL CAUSE ELEMENT
In order to prove that a defendant's substandard conduct was the legal cause of the injuries, the Pinsonneault family must show that the risk of criminal attack is within the scope of protection contemplated by the imposition of a duty. A landmark case instructing the law of negligence on the scope of protection issue and preparing the soil for the development of the duty-risk analysis is Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99 (App.1928). The thrust of Palsgraf was to personalize the duty such that the unintentional act as to the plaintiff "had possibilities of danger so many and apparent as to entitle him to be protected against the doing of it though the harm was unintended." Palsgraf, 162 N.E. at 101.
In Palsgraf, the court declined to find that the defendant railroad owed a duty to protect a plaintiff at the far end of the platform from falling scales which tipped over due to an explosion caused by firecrackers falling on the rails at the other end of the platform. The firecrackers fell on the rails because a company guard caused a passenger to drop the package containing the fireworks when the guard pushed the passenger forward to keep him from falling backward after he jumped aboard a moving train. Obviously the harm, falling scales at the other end of a platform, was so attenuated, and so unexpected to result from the act of assisting a passenger at this end of the platform, that no wrong could be found. The reasoning of the court explained the burden of the plaintiff and the relationship of the duty to the risk of a particular harm:

*182 The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation ... It [is] not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye.
Palsgraf, 162 N.E. at 99, 100 (citations omitted).
Hence, the well-established and pivotal question in determining the scope of the duty is whether this defendant owes a duty to protect this plaintiff from this risk which occurred in this manner. Accordingly, in the present case, where two previous robberies had already occurred at this particular branch of Merchants Bank, a vigilant eye could easily perceive the risk of another armed robbery at the same location. Moreover, the fact that the previous robberies were inside the bank in daylight should only have made the prudent eye more watchful of easier methods of attack attempted under cover of darkness in the more isolated conditions of after-hour banking at a night drop.
Our circuit has not previously decided whether the scope of the duty owed by a bank extends to protect its patrons from criminal activity. However, all types of businesses have been found to be dutybound if the crime and damages were foreseeable or if the business itself assumed a duty to protect its patrons. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). In fact, our Louisiana Supreme Court in Harris v. Pizza Hut looked at cases from other jurisdictions, including Banks v. Hyatt Corporation, 722 F.2d 214 (5 Cir.1984), and acknowledged that while Banks dealt with an innkeeper's liability, "any business" which invites the company of the public must institute reasonably necessary acts to guard against the "predictable risk of assaults." Harris, 455 So.2d at 1369.

Foreseeability
In the present case, where the only product, stock and trade of the business is money, and the business is in effect a "money store" which invites the public to bring in and take out money, and where the risk of robbery is foreseeable due to previous robberies, the risk should be especially predictable where the invitation is to come to an outside box after hours at night. We are cognizant of the 1982 first circuit decision in McKinney v. Louisiana Nat'l Bank, 416 So.2d 948 (La.App. 1 Cir.1982), wherein the court rejected the argument that banks should be held to a higher standard because their product is money. However, the issue in McKinney was breach, not duty. There, the first circuit more or less conceded that the bank had a duty to protect its patrons, but found that it did not breach that duty by failing to post a guard outside the bank in daylight hours to protect a patron from an attempted purse snatching near the bank. We are not bound or instructed by this eighteen-year-old first circuit decision and, in any event, find the case distinguishable. As to duty, where the business is money and money alone, and where previous robberies have occurred at the subject banking office, there is clearly a duty that extends to provide a reasonable measure of security against robberies.
Moreover, the record in this case reveals that Merchants Bank was located in the second highest crime area in Vernon Parish and that of the two previous robberies at the bank, one of the escape routes was through the woods behind the bank, as in this case. Merchants Bank attempts to make much of the fact that the previous robberies were inside the bank during the day and were perpetrated against the bank's tellers only, rather than outside the bank during the night against customers, and that this somehow renders the present robbery completely unpredictable and unforeseeable. Such a position is untenable and logically unsound. In fact, the McKinney court's decision to grant summary judgment to the bank centered upon the fact that the attempted purse snatching occurred in the daytime hours where *183 the presence of other customers rendered a robbery less likely. The invitation to bring money at night in isolation from the daily business which normally traffics bank lobbies, if anything, more greatly proliferates a risk of robbery.
In Romaguera v. Piccadilly Cafeterias, Inc., 94-374 (La.App. 5 Cir. 12/14/94); 648 So.2d 1000, writs denied, 95-0093, 95-0124 (La.3/10/95); 650 So.2d 1183 and 1184, where a restaurant patron was shot in the parking lot, the court found that one prior attempted robbery inside the restaurant adequately illustrated foreseeability. There the court stated that "[t]he fact that there had been an attempted robbery inside the restaurant should, we think, make any reasonable person realize that such an attempt would be even more likely to occur outside the restaurant in the parking area, where there would be fewer people around." Romaguera, 648 So.2d at 1005.
In addition to its experience with prior robberies at the Fort Polk branch of Merchants Bank, the record indicates that the bank received a newsletter entitled the Advisor which repeatedly reported night deposit crimes in which customers were seriously injured and which warned of the need for surveillance and other security measures. Other literature and manuals were available in the industry which also recommended cutting shrubbery, improving lighting, and protecting customers against criminal acts of third persons. These periodicals and literature served to further inform Merchants Bank of the foreseeability of crime at its branch location and at its night depository.
The Pinsonneault family has cited cases from other jurisdictions which we find instructive in explaining the scope of the duty of Merchants Bank and how it encompasses the risk of robbery and assault. In Schaus v. Marine Midland Bank, N.A., 233 A.D.2d 919, 649 N.Y.S.2d 752 (4 Dept. 11/08/96), a customer was fatally shot while making a deposit for his employer at the bank's night depository. Prior criminal activity was alleged. There, the court stated that the defendant bank had a duty to take reasonable precautions to secure its premises if it knew or had reason to know from past experience that there was a likelihood of conduct on the part of third persons which was likely to endanger the safety of its night deposit users. Similarly, in the present case where two previous armed robberies had occurred at this same branch of Merchants Bank, the bank knew or had a reason to know that future crime would occur, and, therefore, had a duty to prevent future armed robberies everywhere on its premises.
In addition to the clear foreseeability of robberies of individual patrons invited by the bank to its night depository, the bank had a mandated duty to provide banking security in this case which arguably created a statutory duty to bank patrons, such as Jesse Pinsonneault, and which at the very least heightened the bank's awareness that this robbery was foreseeable. More specifically, the Bank Protection Act of 1968, 12 U.S.C. § 1881-1884, mandates that within thirty days after a state bank becomes a member of the Federal Reserve System, its board of directors must designate a security officer to write and administer a security plan to be filed with the Federal Reserve Bank. Hence, banking security in general is not only a desideratum; it is mandated in the industry.
In Monnin v. Fifth Third Bank of Miami Valley, N.A., 103 Ohio App.3d 213, 658 N.E.2d 1140 (2 Dist. 3/29/95), where a fact issue regarding the bank's reasonable safeguards to protect its customer from a fatal shooting prevented summary judgment, the court addressed the Bank Protection Act of 1968. The Act authorizes various federal supervisory agencies to promulgate rules
establishing minimum standards with which each bank or savings and loan association must comply with respect to the installation, maintenance, and operation of security devices and procedures, reasonable in cost, to discourage robberies, burglaries, and larcenies and to assist *184 in the identification and apprehension of persons who commit such acts.
12 U.S.C. § 1882.
The federal supervisory agencies given this authority are the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation (FDIC), and the Federal Home Loan Bank Board. Each financial institution answers to the appropriate agency depending upon its status as a national, district, or state bank, or as a savings and loan institution, and depending upon its membership requirements in the various systems. The regulating agency in Monnin was the Comptroller of Currency, and its rules were found to protect the assets and valuables stored in banks, but not necessarily the public. However, the court cited a provision that required employees during or after a robbery "(1) [t]o avoid actions that might increase danger to themselves or others" and indicated that this could arguably impose a non-specific duty to protect the public.
The Monnin court found that the provisions of the Comptroller authorized by the Bank Protection Act of 1968 did not give that bank's customers a private right of action which would warrant the application of the doctrine of negligence per se. The court articulated that negligence per se is the violation of a legislative enactment which imposes a duty to protect others that is so specific that it does not require the "exercise of human judgment." Monnin, 658 N.E.2d at 1148, 1149. Specificity was lacking, and the court found negligence per se inapplicable. However, under a duty-risk analysis, the court found that evidence of two previous robberies, the most recent of which was approximately two and one half years earlier, would allow reasonable minds to find that the bank knew or should have known that an armed robbery could again occur at that location. The court further found that it was not necessary to show that this particular robbery or this particular violence was foreseeable because "foreseeability of the crime [armed robbery] implies foreseeability of the risk of harm." Id. at 1147.
In Orrico v. Beverly Bank, 109 Ill. App.3d 102, 64 Ill.Dec. 701, 440 N.E.2d 253 (1 Dist. 9/1/82), where the bank released $2,100 in 100-dollar bills to an incompetent in violation of a court order, and the incompetent was robbed and killed in a park after flashing the bills openly, the court found the risk of harm foreseeable. The court referenced Prosser, § 43, at 259-60, and stated that, "Even if the harm foreseen is to property and the harm suffered in fact is to the person, the distinction should not be dispositive." Orrico, 64 Ill. Dec. 701, 440 N.E.2d at 257. Hence, in synthesizing Monnin and Orrico, even if the Bank Protection Act of 1968, calling for bank security, foresees harm to property rather than harm to persons, the distinction is not dispositive. It follows that it is foreseeable that the absence of security measures will not only increase the risk of lost assets to the bank, but that absence will also increase the risk of personal injury to the patrons bringing those assets to the bank in the first place.
Merchants Bank's security officer, Perry Johnson, appointed to that position in April of 1992, indicated that one of the agencies promulgating the rules for Merchants Bank was the Federal Deposit Insurance Corporation (FDIC). We have reviewed the FDIC rules located at 12 C.F.R. Part 326 and find them similar to the Comptroller of the Currency's rules in Monnin with regard to the employee directive to avoid actions that might increase danger to others. Additionally, the FDIC rules at 12 C.F.R. Part 326.2 require the designation of a security officer within 30 days after the bank becomes a member of the FDIC "with responsibility for the installation, maintenance, and operation of security devices and for the development and administration of a security program which equal[s] or exceed[s] the standards prescribed by this part."
*185 At Part 326.3 the FDIC regulations require the security officer to consult with a law enforcement officer to determine the security needed based upon crime in the area, the amount of currency exposed to robbery, burglary and larceny, distance from law enforcement, other security measures already in effect at the banking office, and the physical characteristics of the banking structure and its surroundings. At Part 326.4 the FDIC regulations require that the bank, within 30 days of its membership in the FDIC, write and provide for the administration of a security program to protect each of its banking offices from robberies, burglaries and larcenies. It was mandated that the security program provide a schedule for inspection, testing and servicing of all security devices, and that the security officer keep a record of the inspections and maintenance. This part also mandates the training and periodic re-training of employees on the proper conduct and use of security devices during and after a robbery.
At Part 326.5 the FDIC mandates compliance reports at the end of June of each year "certifying to its compliance with the security requirements of this Part." It also provides a suggested form for the certification which states that the security program has been reduced to writing and that the security officer has sought the advice of law enforcement officers and has installed security devices "in each of the bank's banking offices." This part mandates that the bank files shall contain a record showing the name and title of the consulting law enforcement officer advising the bank prior to the installation of security devices. It also mandates reports on security devices at each of its banking offices and crime reports "[e]ach time a robbery, burglary, or nonbank employee larceny is perpetrated or attempted at a banking office."
Parts 326.6 and 326.7, respectively, provide for corrective action by the FDIC Board of Directors and penalties under the Bank Protection Act of 1968 in the event of non-compliance. Additionally, Appendix A provides the minimum standards for security devices including surveillance and alarm systems. Night depositories in particular are to be equipped with burglary alarms. The foregoing requirements are also contained in the regulations promulgated by the Board of Governors of the Federal Reserve System. Hence, based upon the foregoing, the Bank Protection Act of 1968, and the regulations of the FDIC and the Federal Reserve System, mandated the designation of a security officer, a written security plan, investigations, and consultations regarding crime in the area and the need for surveillance and other security measures at every banking office. These mandates created a duty that, even if non-specific enough for a finding of negligence per se, extended to protect bank employees and "others" from robberies, thefts and larcenies as they transacted business on the bank premises. It is inconceivable that a security plan to protect a bank's assets from theft should be held to not include the protection of the bank's depositors from robbery.

Ease of Association
As recognized by the Louisiana Supreme Court in Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972), foreseeability should not in all instances be the only criterion used for determining whether there is a duty-risk relationship. "The ease of association of the injury with the rule relied upon, however, is always a proper inquiry." Hill, 256 So.2d at 622, quoting Prosser, Law of Torts (3rd ed.1964), 282ff In the present case, the question is whether the risk of injury from a robbery, produced by a combination of the bank's act and that of a third party, is within the scope of protection of a rule of law which would mandate reasonable security measures including surveillance cameras, fences, lighting and lower shrubbery. As the Hill court articulated:
All rules of conduct, irrespective of whether they are the product of a legislature *186 or a part of the fabric of the court-made law of negligence, exist for purposes. They are designed to protect some persons under some circumstances against some risks. Seldom does a rule protect every victim against every risk that may befall him, merely because it is shown that the violation of the rule played a part in producing the injury. The task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises. How appropriate is the rule to the facts of this controversy? This is a question that the court cannot escape.
Hill, 256 So.2d at 623 (citation omitted).
We find in the present case that the robbery and shooting death of Jesse Pinsonneault, a night depositor at the defendant bank where two armed robberies had occurred, was a foreseeable risk falling within the scope of Merchants Bank's duty to secure its premises and make them safe for the purposes intended. Moreover, the risk of robbery and assault of a night depositor is easily associated with a rule imposing a duty to provide reasonable security in the form of surveillance cameras, minimum height shrubbery, adequate lighting, and adequate fencing in this particular case.

Assumed Duty
At least one other court has indicated that a duty of protection against assault is automatically assumed by banks and inns because of the kinds of services they offer. In Caronia v. McKenzie's Pastry Shoppes, 97-681 (La.App. 4 Cir. 10/01/97); 700 So.2d 1315, 1320, writ denied, 97-2695 (La.01/09/98); 705 So.2d 1113, Judge Byrnes in a concurring opinion observed that:
The "duty of protection voluntarily assumed" should be reserved for those cases where the business owner expressly or tacitly assumes the duty of protection... businesses such as banks or innkeepers where security is considered to be an intrinsic part of the service offered.
However, in the present case, it is not necessary to rely on a tacit assumption by banks in general of the duty to protect. Merchants Bank expressly assumed this duty when, based upon the FDIC regulations, Merchants Bank developed a security plan of its own in April of 1992. The trial court acknowledged the security plan of the bank and found that Merchants Bank owes a duty to its patrons "to provide a reasonably safe place to conduct normal banking business at its various bank locations." Accordingly, this written plan of Merchants Bank specifically created a duty to protect its patrons in its stated purpose, which provided as follows:
The purpose of bank security is to produce and initiate a positive program of action designed to maximize security for bank employees, the public, and bank assets against crime and other hazards and to comply with the provisions of the Federal Deposit Insurance Corporation Regulations as detailed in subpart A section 326.0 through 326.4.
The plan went on to describe its security officer's functional responsibilities to ensure that all provisions of its security program were implemented, including security training, and to render periodic reports to the Board of Directors to insure their awareness of all security matters at all locations. Hence, Merchants Bank, through its own security program, assumed a duty to provide security for "the public" which specifically included Jesse Pinsonneault. Similarly, in Schaus, 233 A.D.2d 919, 649 N.Y.S.2d 752, the court acknowledged a duty to protect where the defendant bank recognizes the need for safety precautions in its own safety manual. Consequently, the trial court's finding of an assumed duty pursuant to the bank's security manual was correct.
Moreover, in the present case, Merchants Bank invited surrounding businesses to bring money to its night depository, *187 which was located in a high crime area in a branch bank that had undergone two previous armed robberies, at least one of which involved a shooting. Jesse Pinsonneault was the assistant manager of Sambino's Pizza which was located approximately 300 feet away from the bank's night depository. Jesse usually made the last night deposits of the receipts and operating cash around 1:30 a.m. after closing and balancing the store at midnight. The accomplice, Christian Boyd, stated that he and the shooter, Lawson Strickland, had watched Jesse bring the deposit the preceding day and lay in wait for him or whoever brought the Sambino deposit at 1:30 a.m. on November 3, 1992. Based upon the bank's invitation to Sambino's Pizza to bring money to the depository, the bank's experience with prior shooting and criminal attacks, the foreseeability of future criminal conduct, and the bank's assumed duty of security pursuant to its written plan, Merchants Bank was dutybound to provide security to its patrons.
Given Jesse's job to nightly deposit the proceeds of his employer, and the employer's proximity to the bank, it was particularly foreseeable that Jesse could be shot and that "the act as to him had possibilities of danger" so apparent as to render the bank duty-bound to protect him. Accordingly, we find that armed robbery is a risk that threatens bank patrons at a facility where robberies have occurred before, and that the duty of security at Merchants Bank extended to protect Jesse Pinsonneault from the robbery which was perpetrated against him at night outside the bank at its night depository.

BREACH ELEMENT
Once it has been established that the scope of the duty encompassed the risk of robbery and assault, the question becomes whether Merchants Bank breached that duty because it failed to perform the duty in a reasonable and prudent manner. If the duty was breached, the breach is the legal cause of Jesse's injuries, and damages are due his family. In the present case, the Pinsonneault family asserts that Merchants Bank failed in its duty to take reasonable precautions to protect Jesse Pinsonneault from criminal attack because it did not install video cameras, or cut its shrubbery, extend its fence, or improve its lighting, any one of which would have helped to deter this robbery. The Pinsonneault family urges that it was manifest error for the trial court to find that the duty had not been breached. We agree.
The generally accepted view is that negligence is defined as conduct which falls below the standard established by law for the protection of others against an unreasonable risk of harm. RESTATEMENT (SECOND) OF TORTS, § 282 (1965); HARPER, JAMES & GRAY, THE LAW OF TORTS, § 16.1 at 381-382; W. PAGE KEETON, ET AL., PROSSER & KEETON ON THE LAW OF TORTS, § 31. The test for determining whether a risk is unreasonable is supplied by the following formula. The amount of caution "demanded of a person by an occasion is the resultant of three factors: the likelihood that his conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which he must sacrifice [or the cost of the precaution he must take] to avoid the risk." L. Hand, J. in Conway v. O'Brien, 111 F.2d 611, 612 (2d Cir.1940).
If the product of the likelihood of injury multiplied times the seriousness of the injury exceeds the burden of the precautions, the risk is unreasonable and the failure to take precautions or sacrifice the interest is negligence. Id. See also Levi v. SLEMCO, 542 So.2d 1081 (La.1989); Allien v. Louisiana Power & Light Co., 202 So.2d 704 (La.App. 3 Cir.), writ denied, 251 La. 392, 204 So.2d 574 (1967); HARPER, JAMES & GRAY, supra, § 16.9. The foregoing conception has been referred to by legal scholars as the "Hand formula," the "Learned Hand test" or the "risk-benefit" balancing test. See PROSSER & KEETON, supra, § 31 at 173 n. 46; HARPER, JAMES & *188 GRAY, supra, § 16.9 at 468 n. 5; G. RODGERS, RATIONALITY AND TORT THEORY, 54 S.Cal. L.Rev. 1, 8 (1980); R. EPSTEIN, A THEORY OF STRICT LIABILITY, 2 J.Legal Stud. 151, 154 (1973); R. POSNER, A THEORY OF NEGLIGENCE, 1 J.Legal Stud. 29, 33 (1972); G. CALABRESI & J. HIRSCHOFF, TOWARD A TEST FOR STRICT LIABILITY OF TORTS, 81 Yale L.J. 1055, 1056 (1972).
In the present case, where foreseeability of armed robbery at the night depository has been established, the likelihood that the bank's failure to provide security would lead to the shooting death of a night deposit patron far outweighs the cost of installing surveillance cameras, cutting down shrubbery, upgrading lighting and/or extending a fence. The argument of Merchants Bank that it was in the process of implementing its April 1992 security plan is not sufficient to illustrate reasonableness wherein the bank had been operating for well over ten years. As stated, the FDIC, under the Bank Protection Act of 1968, mandated a security officer designation and a security plan implementation within thirty days of membership in the FDIC. The regulations called for an investigation of crime statistics and incidences including robberies, burglaries and larcenies, consultations with law enforcement officers, and the installation of appropriate surveillance equipment at all banking locations.
The bank's own security plan, when it finally wrote one in April of 1992 before the shooting in November 1992, rendered it duty-bound to enforce the FDIC regulations and to protect the public as well as the bank's assets. A duty of protection which has been voluntarily assumed must be performed with due care. Harris, 455 So.2d at 1369. Yet, the record indicates that Merchants Bank installed video surveillance equipment at its other branch night depositories, but not at the Entrance Road branch, which was the only branch in the high crime area and the only branch which had already experienced two armed robberies. It is apparent that the bank did not investigate crime statistics, consider its own history, or update its equipment, which the CEO admitted was antiquated, on a greatest-need-first basis. The trial court indicated that statistics eventually obtained showed that night deposit crimes were less frequent than daytime robberies, employee thefts, and ATM crime. However, this analysis does not reconcile the actions of the bank in installing video cameras at its other two branches' night depositories, instead of in the branch in the higher crime area in general. Moreover, while statistics are often beneficial, the foreseeability of armed robbery somewhere on the premises is sufficient to render the bank duty-bound to protect against it everywhere on the premises.
Further, testimony indicates that the mandated investigations were not made, and there is no evidence that the bank reported the status of its investigations in June of 1992 as mandated by the FDIC. In fact, the bank was cited by the FDIC for its failure to report. Such investigations and reporting would have alerted the bank to the need for improved security measures. Officer Sidney Williams patrolled the area around the bank eight to ten times per night and stated that the lighting, except right under the drive-throughs, was too dim to write his notes, the shrubbery was above waist high, and that he had to shine a hand-held spotlight directly on the shrubbery to determine whether anyone was hiding behind it. Notwithstanding the FDIC regulations which arguably would have directly protected Jesse Pinsonneault, if the bank had done nothing more than read the publications delivered to it and the other available materials distributed by the American Bankers Association, it would have known of the need for video surveillance, improved lighting and landscaping needs.
More specifically, as stated, the bank had been receiving newsletters entitled the Advisor from the American Bankers Association since the late 1980's, some of which were introduced as evidence and appear in *189 the record. These publications warned of security problems at night depositories. The March 1988, Vol. 7, No.12 issue contained the front-page headline: "Security is Everyone's Job" and described a night deposit incident where a college student was shot in the face, lost sight in one eye, and sued the financial institution, after a night deposit customer had earlier warned employees of poor lighting, overgrown shrubbery, and the high crime status of the area. Likewise, the July 1988, Vol. 8, No. 4 issue printed a follow-up story reporting that the same student had been granted the right to another trial for punitive damages against the financial institution.
The June 1990, Vol.10, No.3 issue contained the following:
Unfortunately, customers are being accosted at ATM's and night depositories with increasing frequency, and violence at these exterior facilities has become a factor of particular concern to law enforcement and financial institution officials.
This article then goes on to describe an incident wherein a customer was doused with gasoline and robbed under threat of being ignited.
The February 1991, Vol.10, No.11 issue contained the following headline and first paragraph on the front page:
Night Depository Crimes
The night depository is an area of a financial institution beset by a variety of crimes, ranging from fraud to burglary, theft from customers and, sometimes very violent attacks. Unfortunately, the convenience it affords customers translates to convenience for the criminal, and frequency of use during darkness only exacerbates the condition. This all calls for extra vigilance, extra security consciousness. The following, a varied sampling of just a few of the many night depository crimes reviewed by the Advisor staff, offers some idea of the multiplicity of crimes found in this area of a financial institutions operations.
Various issues of the Advisor also contain information regarding the benefits of surveillance equipment for physical protection because it offers "deterrence and a record of the area under surveillance." March 1992, Vol 11, No.12. "The proper utilization and maintenance of surveillance cameras can be considered a standard of the industryand simply a matter of good business sense." September 1992, Vol 12, No.6. These newsletters also contained regulations of the FDIC and the Board of Governors of the Federal Reserve System on the requirements for security plans and security officers and included recommendations of the American Bankers Association, as well as warnings regarding security related lawsuits and physical injuries to customers.
The April 1991, Vol.11, No.1 issue outlined the regulations and emphasized that "the content of a financial institution's written security program approved by the board and the annual report from the security officer become absolutely critical." The issue warns that bank directors will be more accountable for proper training of the security officer they designate, responsible for ensuring that their financial institution's security procedures and devices meet industry standards, and liable for ensuring that the security program they approve is effectively implemented by the security officer and staff employees.
In addition to the Advisor newsletters, the ABA copyrighted in 1974 the Bank Protection Manual which contained a special section on night depository construction requirements including the installation of a burglar alarm. A paragraph at the bottom of page 2.2.9 states that
The bank also must consider the protection of customers using the night depository. Lighting and location are important, as was noted in previous chapters dealing with automated tellers and cash dispensing machines. The location should be clearly visible, allowing *190 no high bushes, shrubbery, or other obstacles to provide hiding places for robbers of night deposit customers.
Additionally, the Bank Security Desk Reference outlines the Bank Protection Act of 1968 and recommends surveillance cameras at night depositories, and it emphasizes the importance of special training for the bank's designated security officer. Yet, the record indicates that neither Mr. William Droddy, security officer from 1981 to 1991, nor Mr. Perry Johnson, security officer appointed in 1992, was adequately trained for the position. Nor did they conduct the mandated investigations, or apply any of the recommendations regarding shrubbery, lighting, or surveillance cameras.
Plaintiffs' security expert, Dr. Norman Bottom, indicated that the shrubs exceeded the two-foot maximum height for businesses and that the two-sided fence was inferior because evildoers could go around it where it did not run down the side of the property by McDonald's restaurant. The bank's security officer stated that this was primarily for aesthetic reasons. Banking literature specifically warned against being more concerned with aesthetics than safety. The security officer also stated that customers sometimes walked from Mc-Donald's to the bank to conduct business at lunch. However, as pointed out by plaintiffs, the simple notion of a gate opened during banking hours would have answered this concern over customer convenience.
Dr. Bottom further indicated that night deposit and ATM crime had been so prevalent and so publicized in banking publications since the 1970's that he found it incredible and very difficult to accept that Merchants Bank was unaware of it. In fact, such crime was so prevalent that the Louisiana legislature enacted in 1995 the Automated Teller Machines/Night Depository Customer Safety Act at La.R.S. 6:1361, which became effective in July of 1996, to provide for uniform lighting and landscaping standards and for warnings to customers using these services.
Merchants Bank challenges the authority of the literature actually received and/or available to it as not mandating these specific security measures or pronouncing an industry standard. However, this is of no moment, as we have found that where a specific mandate is absent, the repeated warnings from the American Bankers Association in conjunction with the bank's prior experiences of armed robbery at this location created a duty to protect patrons at night depositories, and that duty was breached. Moreover, we find applicable our case law in the product liability arena which instructs us that compliance with industry standards alone is not synonymous with "reasonable behavior." See Hopper v. Crown, 93-2021 (La.App. 1 Cir. 10/07/94); 646 So.2d 933, writ denied, 95-0179 (La.3/17/95); 651 So.2d 275.
Therefore, even if Merchants Bank had complied with the Bank Protection Act of 1968 and the FDIC regulations, if those rules do not specifically mandate protections to save Jesse Pinsonneault's life, the bank is still not excused for its failure to protect him. This is so because prior robberies and non-mandated recommendations made it foreseeable that this injury would occur, and the bank's own security manual rendered it duty-bound to protect Jesse Pinsonneault, a repeat customer and invited patron of the bank, who nightly brought his employer's deposit to the night depository.
Having found that the conduct of Merchants Bank was a cause-in-fact of the plaintiffs' harm, that Merchants Bank owed a duty of security to Jesse Pinsonneault, that the duty encompassed the risk of robbery and assault, that it breached that duty through unreasonable behavior, and that the breach was the legal cause of the injuries herein, we now turn to the quantification of damages. Where we are reversing the issue of liability on appeal we may fix the quantum and award damages to Jesse and his survivors in an *191 amount which is just and appropriate. Thompson v. Louisiana Dep't of Transp. & Dev., 93-1294 (La.App. 3 Cir. 6/29/94); 639 So.2d 864, writ denied, 94-2047 (La.11/4/94); 644 So.2d 1052; Courville v. Piggly Wiggly Bunkie Co., Inc. 614 So.2d 1366 (La.App. 3 Cir.1993).

DAMAGE ELEMENT
The Pinsonneault family asserts as final error that the trial court was manifestly wrong in failing to award wrongful death and survival damages and in not awarding Lejeune damages for Debbie Pinsonneault's bystander claims. We agree and make the following awards.

Wrongful Death Claims
The awards for damages in a wrongful death action are determined by the degree of affection which existed between the deceased and the various different plaintiffs. Buckbee v. Aweco, Inc., 626 So.2d 1191 (La.App. 3 Cir.1993), writ denied, 93-2691 (La.1/13/94); 631 So.2d 1162. Moreover, it is well settled that in awarding damages for loss of society and companionship, Louisiana courts take into consideration the closeness of the family relationship. Mathieu v. State, Dep't of Transp. & Dev., 598 So.2d 676 (La.App. 3 Cir.), writ denied, 600 So.2d 665 (La.1992). In the present case, Jesse and his identical twin brother, Orin, more or less chose James Pinsonneault as their father when they were eleven and one half years old by arranging a meeting between James and their mother, Debbie.
James was their Cub Scouts leader and had a close relationship with the boys. James adopted Jesse and Orin after marrying Debbie, and the family was very close knit. James described them as a "huggy" family. They still lived together as a family unit with the boys taking carpentry classes and planning to start a construction business together.
In the twelve years before Jesse's death, James fished with him, worked on his car with him, and as a military helicopter pilot took the boys to Europe and had them educated there. The family took vacations and skied together and were very affectionate with each other. After Jesse's death, James and Debbie could not bear to drive by the bank where he was shot, and they put in for a compassionate relocation. James had such difficulty dealing with the loss of Jesse that he was temporarily grounded. He questioned his faith and sought counseling from his chaplain. Debbie was literally devastated by the death of her son, and never recovered, ceasing her numerous activities as a military wife who loved crafts and helping others. She was subject to crying spells and, after his death, continued to set a fourth plate at the dinner table, which upon realizing would cause a new onset of grief. Debbie was diagnosed with cancer, and upon her death four years after Jesse's death, it was Jesse for whom she grieved even upon her death bed.
While we are not bound by any prior awards, we may refer to them as aids and for instructive purposes. The Pinsonneaults cite a second circuit case awarding $750,000 to parents for the loss of a thirteen-year-old son. However, our reading of that case, Hood v. State Through Dep't of Transp. & Dev., 587 So.2d 755 (La.App. 2 Cir.), writs denied, 590 So.2d 81 and 590 So.2d 82 (La.1991), indicates that each parent received $175,000, for a total of $350,000 in wrongful death damages. In Dunn v. Gentry, 94-1164 (La.App. 3 Cir. 4/5/95); 653 So.2d 783, writ denied, 95-1148 (La.6/16/95); 655 So.2d 335, we awarded $200,000 to each parent in the death of a six-year-old struck by a truck while boarding a school bus, and in Monceaux v. Jennings Rice Drier, Inc., 590 So.2d 672 (La. App. 3 Cir.1991), we awarded $225,000 to each parent for college-aged daughter who sustained a broken neck. The plaintiffs also cite three third circuit cases for awards ranging from $500,000 to $650,000 for both parents. In Prince v. Mattalino, 583 So.2d 541 (La.App. 3 Cir.1991), the jury awarded $400,000 to each parent for the wrongful death of a two-and-one-half-year-old, *192 and we affirmed the trial court's reduction of the award to a lump sum of $500,000 for survival ($100,000) and wrongful death damages, where $500,000 is the statutory cap for medical malpractice awards. In Corbello v. Southern Pacific Transportation Co., 586 So.2d 1383 (La. App. 3 Cir.), writ denied, 589 So.2d 1052 (La.1991), we affirmed a $250,000 award to each parent in the death of a fifteen-year-old train accident victim, and in Hasha v. Calcasieu Parish Police Jury, 94-705 (La. App. 3 Cir. 2/15/95); 651 So.2d 865, writs denied, 95-667, 95-676 (La.4/28/95); 653 So.2d 592 and 653 So.2d 593, we awarded $325,000 to each parent for the loss of an eighteen-year-old son.
Merchants Bank cites a string of Louisiana Supreme Court and third circuit cases awarding $150,000 to each parent and argues that this is the most often awarded amount for the death of a major child. The bank also points out that both parents in this case had a limited amount of time and memories with Jesse, James because of the later adoption, and Debbie because of her own early death. We find, however, that this family was particularly close, and that because the family still lived together as a unit, Jesse's majority has no bearing on the award. We fix the quantum for the wrongful death of Jesse Pinsonneault at $700,000, or $350,000 for each parent.

Mrs. Pinsonneault's Bystander Claim
Debbie Pinsonneault arrived at Merchants Bank within minutes of the shooting and witnessed Jesse lying in a pool of blood, his body shaking all over, and his face lined with tears. The medics were just beginning to cut his clothes off in order to attend to him. A witness at the scene stated that Debbie was hysterical. Jesse's first words to his mother were "Mom, I love you," as he reached out to hold her hand. This image stayed with her thereafter, through sessions with a psychiatric nurse and friend, Debra Bower, and until Debbie Pinsonneault died four years later of cancer. Accordingly, we award $100,000 for the Lejeune-type by-stander damages of Debbie Pinsonneault.

Jesse's Survival Cause of Action
Damages for the pain and suffering of the deceased are properly awarded if there is a scintilla of evidence of any pre-death pain or suffering by the victim. Mathieu v. State, Dep't of Transp. & Dev., 598 So.2d 676. Jesse Pinsonneault was shot at approximately 1:30 a.m. and died around 10:30 a.m. on November 3, 1992. The bullet shattered his clavicle and caused profuse bleeding. His cries and screams for help could be heard from the parking lot of Sambino's Pizza where his friend waited for him. Dr. Guru P. Ghanta and Dr. Phillip Charles Lindsay testified that victims of this kind of injury suffer an overwhelming sense of doom and impending death. Jesse knew that he was dying and repeatedly asked his mother to contact his brother and his father and tell them that he loved them and to come quickly. He repeatedly stated that he was not going to make it. He appealed to his faith for final salvation. His body continued to shake from the time of the shooting and into the hospital emergency room.
Testimony indicated that Jesse was frightened and in tremendous pain, and that the fear and despondency was apparent in his eyes and his face. The plaintiffs have asked for $500,000 for Jesse's predeath pain and suffering, and have cited Strawder v. Zapata Haynie Corp., 94-453, 94-454 (La.App. 3 Cir. 11/2/94); 649 So.2d 554, where we awarded that amount for two crew members who experienced an explosion and fire aboard ship before drowning twenty to thirty minutes later. The defendant points out that Jesse subsequently became paralyzed from the waist down and that he did not suffer at all after he was sedated for surgery. Defendant suggests $50,000 for his several hours of suffering and cites Bunch v. Schilling Distributing, Inc., 589 So.2d 502 (La.App. 3 Cir.1991), writ denied, 592 So.2d 1319 (La.1992), where we awarded that amount *193 to the mother of a thirteen-year-old auto accident victim who died during surgery seven hours after the accident. However, that case primarily addresses the rights of divorced parents and provides absolutely no insight as to the pre-death suffering, the nature of the injuries, or even the consciousness of the victim after the collision. We believe that $400,000 is the amount we must place upon Jesse's predeath pain and suffering in this violent shooting case.

SPECIAL DAMAGES
The stipulated special damages in this case are $36,890.87, and are awarded accordingly. Hence, the total amount recoverable by the Pinsonneault family is $1,236,890.87.

COMPARATIVE FAULT
The trial court found that Merchants Bank was not at fault, and the court did not deem it necessary to determine the fault of Sheriff Howard, who settled with the plaintiffs prior to trial, or of Lawson Strickland, Christian Boyd, and Kimberly Atkins, who were added as third party defendants by Merchants Bank. Because we reverse and find Merchants Bank liable, we must address the other defendants who may or may not be liable along with Merchants Bank. As stated, the bank asserted the fault of the sheriff and of Sambino's Pizza in its affirmative defenses. However, the party asserting the affirmative defense has the burden of presenting evidence in support of that defense. As Merchants Bank has not adduced any evidence to support those negligence allegations against Sambino's, we will not consider the fault of Sambino's Pizza. We now turn to the remaining defendants who fall into two categories: (1) the negligent tortfeasor, Sheriff Howard; and (2) the intentional tortfeasors, Strickland, Boyd, and Atkins.

Negligence of Vernon Parish Sheriff
Sheriff Howard's negligence for allowing the trustees, Boyd and Strickland, to escape while taking out the trash, is analyzed under Wilson v. Department of Public Safety & Corrections, 576 So.2d 490 (La.1991). Wilson states that custodians of prisoners have a duty to manage the activities of their respective prisons in a manner such that the public is not exposed to an unreasonable risk of harm. However, the state is not the insurer of the safety of its citizens, therefore this duty does not encompass all harm inflicted by an escapee. The operative intent of this duty is to protect the public from being harmed by escaping prisoners while in the process of their escape. Hence, the issue under Wilson is whether Strickland and Boyd were in the process of escaping when the shooting occurred.
The record indicates that after their escape from the Vernon Parish jail on October 28, 1992, Boyd and Strickland were picked up by Kim Atkins and taken to the trailer of Jennifer McCormick and Amy Dempsey in Leesville, Louisiana. Over the next several days, Boyd and Strickland traveled around without disguises and without apparent fear of being caught. More specifically, they went to Fort Polk to obtain money from a friend and went to Oklahoma expecting to obtain further assistance there. However, that assistance did not materialize and they returned to the area they knew, the Leesville area. At various times they went shopping at a Wal-Mart in DeRidder, went to a popular club in Alexandria, went to Toledo Bend, all the while meeting people they had never met before and apparently socializing.
Christian Boyd testified that he and Strickland planned to rob a night deposit customer of Merchants Bank in order to get money to live on, and he indicated that they were no longer on the run. Moreover, if Strickland and Boyd had been in the process of escaping, it stands to reason that since they were on foot, they would have taken the vehicle of Jessie Pinsonneault *194 which was sitting only a few feet from the night depository. Accordingly, we find that Boyd and Strickland were no longer "in the process of their escape." Hence, the Sheriff is not liable under Wilson.

Quantification of Fault of Intentional Tortfeasors
Lawson Strickland is reportedly on death row for the shooting death of Jesse Pinsonneault. Christian Boyd was found guilty of manslaughter as an accomplice in the shooting. Kim Atkins, who was seventeen years old at the time, took the escapees to the trailer initially, subsequently gave Lawson Strickland a gun which she took from her brother's glove compartment, and she later dropped them off at the entrance to the bank. The question we must now decide is whether the fault of these intentional tortfeasors should be used to reduce the plaintiffs recovery in the present case. This is no simple task, and we find ourselves metaphorically between the proverbial rock and the hard place: the rock being our brethren of the Supreme Court, and the hard place being our legislature, or vice versa.
Prior to April 16, 1996, the comparison or quantification of fault of intentional tortfeasors was at the courts' discretion. In tort cases such as this one, where the conduct of both negligent and intentional tortfeasors caused the plaintiffs injuries, the comparative fault doctrine could be used to compare negligence and intent. In Veazey v. Elmwood Plantation Associates, Ltd., 93-2818, p. 8 (La.11/30/94); 650 So.2d 712, 717, which we find compelling, logical, valid, and applicable to the facts in this case, the Louisiana Supreme Court framed the issue as, "whether the comparative fault law extends to wrongful conduct at the opposite end of the spectrumintentional torts." The court found that while comparative fault under La.Civ.Code art. 2323 is broad enough to encompass both unintentional and intentional conduct, the Civil Code does not define "fault," and "this Court has heretofore read La.C.C. art 2323 as leaving it to the Court's discretion to determine in what contexts the doctrine of comparative negligence should be applied." Id. at 718. The court then determined that the question should be decided on a case-by-case basis.
In Veazey, where a tenant was raped in her apartment due to poor security at the apartment complex, the court articulated its rationale for assessing one hundred percent of the damages against the apartment complex and for refusing to apply comparative fault between the complex and the rapist as follows:
First and foremost, the scope of [defendant's] duty to the plaintiff in this case clearly encompasses the exact risk of the occurrence which caused damage to the plaintiff. As a general rule, we find that negligent tortfeasors should not be allowed to reduce their fault by the intentional fault of another that they had a duty to prevent.
Second, Southmark ... should not be allowed to benefit at the innocent plaintiffs expense by an allocation of fault to the intentional tortfeasor under comparative fault principles ... application of comparative fault principles in the circumstances presented ... would operate to reduce the incentive of the lessor to protect against the same type of situation occurring again in the future. Such a result is clearly contrary to public policy.
Third ... intentional wrongdoing "differs from negligence not only in degree but in kind, and in the social condemnation attached to it." ... Because we believe that intentional torts are of a fundamentally different nature than negligent torts, we find that a true comparison of fault based on an intentional act and fault based on negligence is, in many circumstances, not possible.
Veazey, 650 So.2d at 719, 720 (citations omitted).
This rationale is further bolstered by the legislature's different treatment of intentional *195 tortfeasors in La.Civ.Code arts. 2323 and 2324, which continue to hold them solidarily liable and which attempt to prevent a reduction of the plaintiff's damages because of intentional acts. Hence, metaphorically again, negligent tortfeasors and intentional tortfeasors are like apples and oranges which are not always susceptible of comparison simply because they both qualify as fruit.
However, Act 3 of the 1996 Legislature amended La.Civ.Code art. 2323 to provide in subpart A that "the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined." (Emphasis added.) Hence, we now appear to be legislatively mandated to quantify the fault of the intentional tortfeasor, although he is not expressly listed in subpart A. Moreover, the Louisiana Supreme Court has made the Article 2323 quantification rule retroactive to this 1992 shooting of Jesse Pinsonneault. Keith v. U.S. Fidelity & Guar. Co., 96-2075 (La.5/9/97); 694 So.2d 180. However, neither the Supreme Court nor the legislature has mandated how to use the quantification of fault, and neither has overruled Veazey, which wisely gave the courts latitude to work with the facts in each given case in deciding whether to assess damages to the intentional tortfeasor. Further, the discretionary power of the court has been preserved in the current and unchanged version of La.Civ. Code art. 2324.1, which states: "In the assessment of damages for offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." Therefore, while we are mandated to quantify the fault of all persons causing injury, we are not under express mandate to assess damages to all persons causing injury.
More specifically, the 1996 amended version of La.Civ.Code art. 2323, which applies retroactively to the shooting death of Jessie Pinsonneault, provides as follows:
Art. 2323. Comparative fault
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.

(Emphasis added.)
Hence, it appears that 2323(A), which does not mention intentional tortfeasors, requires that the fault of all persons, including intentional tortfeasors, must be determined. However, it is clear under 2323(C) that the partly negligent plaintiff is not to be penalized for the intentional harm that has befallen himi.e., "his claim for recovery of damages shall not be reduced." What of the completely innocent, non-negligent plaintiff such as we have in this case? Surely he should be entitled to at least as much as the negligent plaintiff, such that his damages "shall not be reduced" by the fault of the intentional tortfeasor. *196 To penalize the non-negligent plaintiff by forcing an allocation of fault to intentional tortfeasors and then using that allocation of fault to reduce the innocent plaintiff's recovery would be absurd. The absurdity is not lessened by the addition of negligent tortfeasors who had a duty to protect the plaintiff from the intentional tortfeasors, and whose negligence is the legal cause of the plaintiff's injury, as in the present case.
Notwithstanding the ambiguity of how or whether the allocation of fault is to be applied in actually assessing damages, Article 2323(A) mandates that we "determine" the percentages of fault of all tortfeasors. Because we are mandated to do so, we shall.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985).
Our consideration of these factors suggests that some fault must rest with Merchants Bank. The causal relation between negligent landscaping, lighting, and location of the night depository, and an attack by criminals under cover of night is a direct one. Based upon information available to it and directives imposed upon it as set forth above, the bank's conduct did not result from inadvertence, but involved an awareness of the danger. An inordinately great risk, loss of life of a depositor, was created by the conduct of the bank. The significance of what was sought by the conduct was, at least in the instance of the inadequate fencing, tragically only a desire to preserve an aesthetically pleasing appearance. The bank possessed a superior capacity for making its premises safe, both in terms of economic affordability and in the availability of appropriate equipment. We, therefore, allocate forty percent of the fault to Merchants Bank under Article 2323 and Keith. Accordingly, sixty percent of the fault is allocated to the intentional tortfeasors, Strickland, Boyd and Atkins, in the proportion of twenty-five percent each to Strickland and Boyd, and ten percent to Atkins.
Having allocated those percentages of fault to the negligent and intentional tortfeasors, we now turn to the assessment of damages. The quandary into which we are thrust in trying to interpret Articles 2323(A) and 2323(C), which tell us first to quantify all fault and tell us next not to reduce the plaintiff's recovery by his own or the intentional tortfeasors' fault, is intensified by La.Civ.Code art. 2324. The 1996 amended version abolishes solidary liability among negligent tortfeasors but preserves solidarity among intentional tortfeasors without addressing the plaintiffs advantage in 2323(C) of not having his damages reduced when he has been intentionally hurt. Moreover, neither article addresses its impact on the completely innocent plaintiff. Since both articles specifically address the contributorily negligent plaintiff, perhaps neither was intended to be applied to the non-negligent plaintiff. Even more confusing is the retroactivity of Article 2323 and the nonretroactivity of Article 2324. See Aucoin v. Dept. of Transp. & Dev., 97-1938, 97-1967 (La.4/24/98); 712 So.2d 62. Under the pre-amendment version of Article 2324, applicable to this 1992 shooting, the solidary liability of all tortfeasors is preserved only if "otherwise provided by law." If not otherwise provided by law, the intentional tortfeasors are solidarily liable, and the negligent tortfeasors are solidarily liable only to the extent that a negligent plaintiff could potentially recover fifty percent of his "recoverable" damages from *197 each defendant, as long as his fault was less than the paying tortfeasor. Under the amended version of 2324, solidary liability is only retained among the intentional tortfeasors. However, again, neither version of Article 2324 addresses the non-negligent plaintiff.
In cases involving non-negligent plaintiffs who have been harmed by two tortfeasors whose conduct was the legal cause of the plaintiff's injuries, the courts have refused to apply the limitations of Article 2324. As Turner v. Massiah, 94-2548 (La.6/16/95); 656 So.2d 636, concluded, an apportionment of fault cannot always be utilized as an apportionment of damages. There, where the court found that two medical providers injured the plaintiff and either doctor could have prevented the harm, the court articulated:
The percentage of fault and legal cause are two separate inquiries. La.Code Civ.P. art. 1812(C). The fact that the relative culpability of the providers can be assigned a percentage does not mean that in terms of legal cause each provider was not responsible for the whole injury. The negligence of each provider in this case was the legal cause of the entire damage.
Id. at 639. Also, the Turner court in footnote 3 noted that the malpractice at issue therein arose prior to the 1987 amendment limiting solidarity to ensure only a fifty percent recovery, but stated that the statute also did not apply because each defendant's conduct was the legal cause of all of the plaintiff's harm:
[W]hen a tortfeasor is the legal cause of 100% of the victim's harm, his liability for 100% of the victim's damage is based on more than the imposition of a solidary obligation between joint tortfeasors, and an apportionment of fault cannot relieve him of responsibility for damages for which he is the legal cause. The amendment to La.Civ.Code art. 2324 has not changed this result.
The Turner court applied the reasoning in Lambert v. U.S. Fidelity & Guar. Co., 629 So.2d 328 (La.1993) (also involving a non-negligent plaintiff), which held that Article 2324, reducing solidary liability to the extent necessary for the plaintiff to recover fifty percent of his damages, did not dictate a change in the general rule that an original tortfeasor may be liable for suffering caused by a second tortfeasor. There, where a tort victim's injury was furthered by alleged malpractice in treating the original injury, the court reaffirmed its pre-amendment holding in Weber v. Charity Hospital of La. at New Orleans, 475 So.2d 1047 (La.1985), that the duty on the tortfeasor to refrain from causing injury to another encompasses the risk that the second injury may occur. Having found that the original tortfeasor's conduct was the legal cause of the injuries caused by the second tortfeasor, the court assessed one hundred percent of the damages against the original tortfeasor.
Similarly, in the present case, the duty of the twice-robbed Merchants Bank to protect its night depositors encompassed the risk that the absence of such protection would result in a criminal attack. We have found, where testimony indicated that the perpetrators would not have chosen this location but for Merchants Bank's faulty landscaping, lighting, and location of the night deposit box, that the conduct of Merchants Bank was the legal cause of the shooting. Therefore, under Lambert and Turner, which did not involve the egregious conduct of intentional tortfeasors, the assessment of one hundred percent of the damages to Merchants Bank is appropriate.
Louisiana Civil Code Article 2323(A) does not, standing alone, mandate a reduction of recovery unless the plaintiff is partly negligent. Moreover, Article 2323(C) mandates that the fault of the intentional tortfeasor not reduce the plaintiffs damages even if the plaintiff is partly negligent. Article 2323 and the pre-amended version of Article 2324 limiting the plaintiffs recovery appear to be in conflict, even for the negligent plaintiff, and the results *198 reached by a literal translation of the articles, especially for the non-negligent plaintiff, are absurd. That is, a literal reading of the statute would lead to the nonsensical and absurd result that a negligent plaintiff could recover one hundred percent of his damages if only intentional tortfeasors were involved, while a blameless plaintiff would not, even though there existed a negligent tortfeasor who was duty-bound to protect the plaintiff from the intentional tortfeasors. We refuse to countenance such absurdity. As was stated in State v. Ste. Marie, 98-1167, pp. 2-3 (La.12/18/98); 723 So.2d 407, 409 (citations omitted):
As a general rule, "[t]he plain meaning of legislation should be conclusive, except in the `rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters' [in which case] the intention of the drafters, rather than strict language controls." "When the literal construction of a statute produces absurd or unreasonable results, the letter must give way to the spirit of the law and the statute construed so as to produce a reasonable result."
Accordingly, while we are under mandate to quantify the fault of "all persons" contributing to the injury, even though intentional tortfeasors are not included in the list in Article 2323(A), we are not mandated to use the quantification of fault to reduce the Pinsonneault family's recovery. The intention of the drafters was not to penalize an injured party because of the intentional acts of a tortfeasor, but rather to avoid that result, as evidenced by Article 2323(C). In this case, the scope of the bank's duty included the protection to the plaintiff against the very risk posed by the robbers and killers. The bank was undeniably and indisputably the legal cause of the injuries. Our allocation of fault is mandated by Article 2323. However, because fault is allocated does not mean that the plaintiffs are not entitled to collect one hundred percent of the damages from the bank whose negligence was the legal cause of all of the plaintiffs injuries. If interpreted literally and applied in cases involving non-negligent plaintiffs and negligent and intentional tortfeasors, the 1987 and 1996 amendments to Article 2324, particularly the 1996 amendment, are in derogation of the long recognized and established rights of tort victims in Louisiana to full recovery against tortfeasors. As a result, these articles should be strictly construed and discriminatingly applied. We have attempted to construe the interplay between Articles 2323 and 2324 so as to allow the least injurious impact to injured victims. See Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La.6/30/95); 657 So.2d 975 (Dennis, J., concurring) (superseded by statute as stated in Keith, 694 So.2d 180).
Based upon the policy considerations in Veazey, 650 So.2d 712, which did involve a faultless plaintiff and an intentional tortfeasor, we decline to assess damages to the intentional tortfeasors in the shooting death of Jesse Pinsonneault so as not to reduce the incentive of businesses like Merchants Bank to protect against the same type of situation occurring again in the future. As stated, pursuant to Veazey, we find that public policy would be violated by reducing the negligent tortfeasor's liability for damages by the percentage of fault of the intentional tortfeasor. We, therefore, quantify the fault at forty/sixty, but assess damages at one hundred percent against the negligent tortfeasor, Merchants Bank, whose duty it was to protect Jessie Pinsonneault from the intentional acts of Lawson, Boyd and Atkins. Our decision to nullify the impact of the intentional tortfeasor's fault on the plaintiffs' recovery is based on principles of sound statutory and codal interpretation and because it produces "a reasonable result." Veazey and its principles are still viable.[3] *199 Even though 2323 mandates a quantification, that does not decrease the negligent tortfeasor's liability for full recovery. Liability attaches to the bank for one hundred percent of the recovery because the bank is the legal cause of one hundred percent of the victim's harm.
Merchants Bank asserts as final error, in the event of our finding it liable, which we do herein, that the trial court erred in dismissing its third party claims against the intentional tortfeasors, Strickland, Boyd, and Atkins. Because we find the bank one hundred percent liable for the damages to the Pinsonneault family, and because we decline to include the fault of the intentional tortfeasors in the recovery of damages for the reasons stated above, pre-amendment Article 2324 contribution is not available, and we will not disturb the dismissal of the intentional tortfeasors as third-party defendants.

IV.

CONCLUSION
Based upon the foregoing, we reverse the judgment of the trial court which dismissed the plaintiffs' case and award the total amount of $1,236,890.87 with legal interest from the date of judicial demand for all elements of the plaintiffs' damages, assessing Merchants Bank with one hundred percent of that amount for the shooting death of twenty-three-year-old Jesse Pinsonneault.
REVERSED AND RENDERED.
NOTES
[1] Mrs. Pinsonneault died during the pendency of this lawsuit and her son, Orin Pinsonneault, was substituted as a party plaintiff.
[2] This action arose prior to the 1996 amendments to La.Civ.Code arts. 2323 and 2324. Article 2323 is retroactive regarding quantification See Keith v. U.S.F. & G., 96-2075 (La.5/9/97); 694 So.2d 180, while Article 2324 regarding solidarity is not. See Aucoin v. DOTD, 97-1938, 97-1967 (La.4/24/98); 712 So.2d 62.
[3] We are not called upon to determine the impact of the 1996 version of Article 2324(B) on Veazey and its policy implications. That is left for another day.